## SOVEREIGN *v.* SOVEREIGN.

1. APPEARANCE—SPECIAL APPEARANCE—JURISDICTION—GENERAL APPEARANCE.

   A party who filed a special appearance and then asked the court to hold the matter is *res judicata,* that no cause of action has been stated and that the merits are such that plaintiff did not come into court with clean hands, did not thereby deny jurisdiction of the court but invoked it and thereby effected a general appearance.

2. EQUITY—JURISDICTION—ADEQUATE REMEDY AT LAW.

   Generally, equity will not entertain jurisdiction where by statute a full and adequate legal remedy has been provided.

3. SAME—JURISDICTION—CUSTODY OF CHILDREN.

   A court of chancery has jurisdiction to determine the custody of a child whose separated parents unsuccessfully sought to obtain a divorce and each dispute the other's right to custody of boy born in 1948, there being no specific statutory remedy available in any court.

Appeal from Bay; Louis (David R.), J. Submitted October 16, 1957. (Docket No. 77, Calendar No. 47,363.) Decided October 13, 1958.

Petition by Will F. Sovereign against Mary K. Sovereign, originally for annulment, amended to ask determination of custody of child independent of

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 3 Am Jur, Appearances §§ 10, 16.
[2] 19 Am Jur, Equity § 101.
[3] 17A Am Jur, Divorce and Separation § 827; 19 Am Jur, Equity § 152.

Power of court which denies divorce or legal separation to award custody or make provision for support of child. 113 ALR 901, 151 ALR 1380.

any other proceeding. Petition dismissed. Plaintiff appeals. Reversed and remanded.

*Poppen, Street & Sorensen (Harold M. Street,* of counsel), for plaintiff.

*Amici curiae:*

· *Paul L. Adams,* Attorney General, *Stanton S. Faville,* Chief Assistant Attorney General, *Samuel J. Torina,* Solicitor General, and *Maxine Boord Virtue,* Assistant Attorney General.

*Jason L. Honigman,* Chairman of the Civil Procedure Committee of the Judicial Conference.

· *Charles W. Joiner,* Chairman of the Committee on Civil Procedure, State Bar of Michigan.

SMITH, J. (*concurring*). The case before us squarely presents this issue: Does a court of chancery have jurisdiction over the allegedly abused or neglected children of a marriage if the bill filed is addressed solely to their welfare and contains no prayer for annulment or divorce? To put it in other terms, is chancery jurisdiction as to custody of such children only subordinate and ancillary to some other well-recognized subject of equity jurisdiction? Or, in the alternative, is the custody of such children, in and of itself, a proper sphere of equitable jurisdiction? We can conceive of few topics of equal importance to our people as the divorce rate soars and as the children of the marriage are cast without.* A few such tragedies are too many. When tens of thousands are affected it becomes a national re-

---

* An estimated 382,000 divorces and annulments were granted in 1956, special report of the United States Department of health, education, and welfare, national office of vital statistics, Vol 48, No 3, April 9, 1958.

proach.   We approach the issue tendered with humility, consoled only by the thought that in our scheme of things such decisions must of necessity be made by those on the woolsack, however imperfect their attainments.

The action before us, in chancery, comes to us from the county of Bay, the residence of petitioner Will F. Sovereign.   The petition prayed annulment of his marriage to Mary K. Sovereign, determination of property rights, award of custody of their son, Will F. Sovereign, Jr. (born January 1, 1948, now with the defendant-mother), and injunctive relief.   These prayers were coupled with the traditional invocation of the chancellor's powers, "such other and further relief as shall appear agreeable to equity and good conscience."   Process was served personally upon the defendant in the city of Saginaw by Deputy Sheriff Howard Maturen.   No question is raised as to the validity of the service.   Defendant thereafter entered "a special appearance   *   *   *   for the sole purpose of making a motion to dismiss the petitioner's petition to annul marriage, award custody, and determine property rights, for the following reasons:

"(1) The subject matter of said suit is barred by a prior decree.

"(2) The petition does not state a cause of action.

"(3) The court does not have jurisdiction.

"(4) The petitioner does not come into court with clean hands.

"This motion is based upon the files and records of this cause and the files and records of the case of Mary K. Sovereign *v.* Will F. Sovereign, in the circuit court for the county of Saginaw, in chancery, Case No. 29,905, and the opinion of the Supreme Court of the State of Michigan reported in 347 Mich 205, and upon the affidavit of Mary K. Sovereign, hereto annexed."

These parties have been before our Court upon a prior occasion. In the case of *Sovereign* v. *Sovereign,* 347 Mich 205, we reversed the decree of divorce (and order amending the same) entered below and held that "decree may enter here dismissing" the bill, brought by the wife, and the cross bill. In the case at bar, in the hearing upon the motion above described, defendant argued that (in view of the former divorce action) the doctrine of *res judicata* barred the action before the Court. Petitioner, however, conceding that "the main purpose of this petition is to determine custody," stated that in view of defendant's opposition he would "amend and withdraw the annulment and property settlement angle and leave it solely as a petition to determine custody."

Before proceeding to our consideration of the arguments made in support of the parties' respective positions, we will note that we find no need to rule upon a point raised by *amici curiae* that jurisdiction over the child may have remained in the chancellor who heard the former divorce action despite our dismissal of the bill and cross bill. The parties have not urged this position and we find nothing in the pleadings, orders, or decree suggesting such attempted retention of jurisdiction. The matter of continuing jurisdiction under these circumstances is cloudy and confused and much may depend upon the essence of the relief asked by the parties, that is, whether in the particular case custody is merely incidental to divorce, or divorce incidental to custody. See *Urbach* v. *Urbach,* 52 Wyo 207 (73 P2d 953, 113 ALR 889). The cases pro and con will be found in an annotation to the *Urbach Case,* in 113 ALR 901.

Petitioner's bill having relied, in part, upon CL 1948, § 722.541 (Stat Ann 1957 Rev § 25.311),* defendant first urged that the petition "does not state a cause of action nor does the court have jurisdiction" under such statute independent of a divorce or separate maintenance proceeding. Petitioner, while not conceding the inapplicability of the statute, argued in reply that even without statute, chancery had jurisdiction, pointing to the fact that the home was irrevocably broken, the parties living apart, the boy's welfare endangered and that he was vulnerable to successive pullings and haulings as the parents each in turn might seek to gain his custody by stratagem, wile, or force. A court of chancery, petitioner asserted, "stands virtually open as to a minor child whose interests are involved. * * * We have a boy here who has a future ahead of him, who needs to be protected, and I am calling upon the court of chancery to do that." The court, however, in a careful and thoughtful summary of the law, disagreed, pointing out considerations of public policy militating against awards of custody in event of minor or temporary disagreement between the parents, there being no proceeding pending for divorce or separate maintenance, and suggesting the possi-

---

* "Sec. 1. That in case of the separation of husband and wife having minor children, the mother of said children shall be entitled to the care and custody of all such children under the age of 12 years, and the father of such children shall be entitled to the care and custody of all such children of the age of 12 years or over: Provided, That any probate court or any court of competent jurisdiction may, on petition and hearing thereof, make and enforce such order or orders as it may deem just and proper as to the care and custody of such minor children, excepting in cases where an order or decree may have been made by any court in chancery, regarding such children: And provided, further, That nothing in this act shall prevent any court of competent jurisdiction from making and enforcing any such order or orders as it may deem just and proper as to the care and custody of such minor children in the same manner and with like effect as it could if this act had not been passed."

bility of relief in the probate court. An order dismissing the petition was thereupon entered.

A procedural point must first be settled. In response to the petition and summons, defendant entered what was captioned a "special appearance." The special appearance is an anomaly, a tribute to the ingenuity of the common law. The defendant, in an action *in personam,* is permitted to walk before the bar of justice and argue that he is not there. Obviously this requires a sort of magic. We find it in the utterance of certain words ("I appear before you specially") but it is a tricky business because if he does certain things regarded as inconsistent with his incantation (such as arguing the merits) the magic is gone, the hour has struck, and he is legally, as well as physically, present. The device serves, however, a useful purpose. It permits a litigant to test the validity of the legal proceedings themselves prior to shouldering the not inconsiderable burdens of time and money required for the litigation on the merits.[*] A defendant, in other words, is entitled to challenge jurisdiction prior to trial on the merits.

Nevertheless the word "jurisdiction" remains and we must again address ourselves to it. Its loose use only betrays us into error. Thus defendant asserted in *Buczkowski* v. *Buczkowski,* 351 Mich 216, that the court had no "jurisdiction" (actually meaning that it was in error) to make a certain disposition of property, although the persons and the subject matter were properly before the court. We there pointed out that, given these elements, the court had jurisdiction in the legal sense, and, as far as its alleged error was concerned, if it had jurisdiction to hear and decide it also had jurisdiction to make

---

[*] See, generally, Wright, Recent Legislation Affecting the Defendant's Appearance in Court, p 223, in Current Trends in State Legislation, 1953–1954, published under the auspices of the legislative research center of the University of Michigan Law School.

a mistake. In the matter before us, similarly, we are faced with the meaning of the word "jurisdiction." It is elementary that in an action *in personam* (as distinguished from an action *in rem,* or *quasi in rem,* with neither of which we are here concerned) a court must have jurisdiction over the person and jurisdiction over the subject matter. As to the former, a defendant may assert that he was never properly served, a problem of some complexity with respect to persons who exist only in the eyes of the law, such as corporations. No claim of defect in service is made here. As to subject matter, "jurisdiction" is concerned with the type of action the court is empowered to hear and decide. Thus a probate court has no "jurisdiction" over a bill to quiet title. The assertion of both such defects (*i.e.,* person and subject matter) we have held, may, under Court Rule No 18 (1945) be joined without constituting a general appearance (*Woodliff* v. *Baker,* 279 Mich 356) though the weight of authority in the courts of the nation having passed on the issue is to the contrary. Further than that, however, we do not go. If the defendant asks other relief, which can be granted only upon the hypothesis that the court has jurisdiction, he has made a "general appearance." *Miollis* v. *Pure Milk Association,* 302 Ill App 115 (23 NE2d 582) (a motion to strike on the ground that a cause of action had not been stated held to invoke the jurisdiction of the court on the merits); *Stubblefield* v. *Warren County,* 170 Tenn 211 (93 SW2d 1269) (defense of statute of limitations held to be upon the merits and amounting to a general appearance); *Grieve* v. *Huber,* 38 Wyo 223 (266 P 128) (plea of former final judgment bore such "substantial relation to the cause" as to amount, in conjunction with other pleas, to a general appearance). We are not bemused by the form of words used, by the caption as special or general. We look to the relief asked.

.Here the defendant asks the court to hold that the matter is *res judicata*, that no cause of action has been stated, and that the merits are such that plaintiff did not come into court with clean hands. In so asking, defendant is not, in truth, denying jurisdiction but invoking it, not denying the court's power to hear and decide issues going to the merits, but insisting that the court do just that. The appearance made was a general appearance.

We come now to the heart of the case. All parties involved are before the chancellor, father, mother and child. The prayer for annulment has been stricken from the bill, as well as that for division of property. What remains is a naked prayer for custody. It is asserted that the father and mother have been living apart for some 5 years, that a decree of divorce has been denied them, that the mother is associating the child with "an ex-convict and a man of utterly dissolute character * * * [with whom she has] maintained an illicit and adulterous relationship," that she has neglected the child, is morally unfit for his custody, and has concealed his whereabouts upon the occasion of his father's attempted visits. Although answer was not filed, we deem it proper to note that the mother filed an affidavit in support of her motion to dismiss in which she stresses the school and church affiliations of her son and sets up allegations which, if true, reflect adversely upon the father. A counteraffidavit, also, was filed by the father, traversing certain of the mother's allegations. The picture painted, in its entirety, is dark and somber. When we read that (upon the occasion of one attempted visit) the father "could hear his son crying in the bedroom, but defendant refused to come to the door or permit the boy to see his father," we are sensitive to the anguish of the father, and the distress of the mother, but we are even more sensitive to the plight of the child. In

this situation does the chancellor have, in the technical and legal sense, "jurisdiction" to make a custodial order as to the child? Or, is he without jurisdiction of the subject matter, in the same legal position as a traffic referee who might purport to grant a divorce? If, moreover, such jurisdiction exists, what is its source?

In the resolution of these questions, of such transcending importance to our people, we have had the assistance of briefs *amici curiae,* filed, at our request, by the attorney general, by the Honorable Jason L. Honigman, chairman of the civil procedure committee of the judicial conference, and by Professor Charles W. Joiner, chairman of the committee on civil procedure of the State Bar of Michigan. We acknowledge our debt to their research.

Our first inquiry relates to petitioner's prayer in his bill that custody of the minor child be awarded petitioner pursuant to the provisions of CL 1948, § 722.541 (Stat Ann 1957 Rev § 25.311). This section of our statute (quoted in full, *supra*) provides, in part, that "in case of the separation of husband and wife having minor children, the mother of said children shall be entitled to the care and custody of all such children under the age of 12 years, and the father of such children shall be entitled to the care and custody of all such children of the age of 12 years or over."

The proper interpretation of this section involves much of history. Contained in its few phrases are years of struggle. Adequate description of the status of women in the home and in society during the years of development and growth of our early common law requires a Shakespearian, not a judicial, pen. The picture we receive, sketchy as it is, of late 16th and early 17th century women is, by today's standards, a depressing one. She was regarded as a creature (the choice of words is not our own) of lim-

ited intellectual attainments or possibilities. Education was largely denied her. There were few schools for even the girls of the wealthier families and the training given in those was limited to that of a "polishing nature, music and the arts." There was almost no opportunity for the rigorous intellectual discipline given to young men. They were married young, pawns in their father's hands for the attainment of title or prestige. They could not possibly hope to reach, in fact, they were not "meant" to reach, intellectual equality with their husbands. Their existence, socially and economically, pivoted around that of a dominant husband, authoritarian and paternalistic.[1]

Such being the predominant social and moral beliefs, rare indeed were the circumstances under which a court of law would interfere with a father's custody of his infant children. The father's claims were so exclusive that a comparison with the position of the *pater familias* in Roman law, with its right to sell the child in the open market, or even put to death,[2] inevitably comes to mind. The English father might, if he wished, deny the mother access to the child during his life (*Ball* v. *Ball*, 2 Sim 35 [57 Eng Rep 703]). And even after death his withered hand might prevent their reunion through his appointment of a testamentary guardian under the authority of the statute, 12 Car 2, c 24,[3] as amended by the wills act of 1837.[4] As stated by Lord Chancellor Cottenham in *Talbot* v. *Earl of Shrewsbury*, 4 Myl & Cr 672, 683 (41 Eng Rep 259), "It is proper that

[1] The English Woman, 1580–1650, by Wallace Notestein, pp 69–107, from Studies in Social History, edited by J. H. Plumb. Longmans, 1955.

[2] Hunter, Introduction to Roman Law (9th ed, 1934), p 30, cited in Selected Essays on Family Law (1950), p 609.

[3] See section 8, 20 Halsbury's Statutes of England (2d ed), p 374.— REPORTER.

[4] A Century of Family Law, 1857–1957, edited by Graveson and Crane, pp 59, 60.

mothers of children thus circumstanced [*i.e.,* where the father had appointed a testamentary guardian] should know that they have no right, as such, to interfere with testamentary guardians." Not surprising, then, the holdings in such cases as the *DeManneville Cases** where the mother left the father shortly after the birth of the infant "on account, as she alleged, of ill-treatment, and kept the child whom she was nursing with her." The husband, however, "found means, by force and stratagem, to get into the house where she was, and had forcibly taken the child then at the breast, and carried it away almost naked in an open carriage in inclement weather; with a view, as the mother apprehended, of taking it out of the kingdom." The court hearing the habeas corpus, was clear as to the law: "But he is the person entitled by law to the custody of his child" and it was held, *per curiam,* that "the child be remanded to the custody of the father." (*Rex* v. *DeManneville,* 5 East 221, 223, 224, *supra.*)

Much of the cruelty of the early law was modified by statute† in England, and an enlightened public conscience found expression in other countries as well. It was in the same year as the passage of the custody of infants act, *supra,* that our legislature passed P.A. 1873, No 192, providing as follows:

"Sec. 1. That in case of the separation of husband and wife, having minor children, the mother of said children shall be entitled to the care and custody of all of such children under the age of 12 years; and the father of such children shall be entitled to the

---

* *Rex* v. *DeManneville,* 5 East 221 (102 Eng Rep 1054); *DeManneville* v. *DeManneville,* 10 Ves Jr 52 (32 Eng Rep 762).

† Talfourd's act of 1839; custody of infants act of 1873, cited in 1 Schouler, Marriage, Divorce, Separation and Domestic Relations (6th ed) (1921), § 742.

See 2 & 3 Vict (1839), ch 54, repealed by custody of infants act, 1873, 36 & 37 Vict, ch 12, section 1 of which was repealed as no longer necessary by Stat Law Revision (No 2), 1893, 56 & 57 Vict, ch 54. See, also, 12 Halsbury's Statutes of England, p 940.

care and custody of all of such children of the age of 12 years and over: *Provided,* That nothing in this act shall prevent any court of competent jurisdiction from making and enforcing any such order or orders as it may deem just and proper as to the care and custody of such minor children, in the same manner and with like effect as it could if this act had not been passed."

In 1879 the statute was amended by PA 1879, No 163 to its present form by the addition of a new proviso clause inserted immediately before the original proviso clause (and by the insertion of the word "further" in the original proviso clause) stating:

"Provided, That any probate court or any court of competent jurisdiction may, on petition and hearing thereof, make and enforce such order or orders as it may deem just and proper as to the care and custody of such minor children, excepting in cases where an order or decree may have been made by any court in chancery, regarding such children."

It is clear that this statute was not a statute conferring jurisdiction. The legislature's awareness of existing jurisdictions is shown in the original act as well as its amendment. It was the purpose of this statute to temper the harshness of the early common law which had so favored the father's custodial position, even though in this country the doctrine had never attained the full sweep and authority of the early English law. (Tiffany, Domestic Relations [3d ed], p 344.) Petitioner's reliance, then, upon this statute, as a source of jurisdiction in chancery is misplaced. It is directed at custody. It confers no jurisdiction. (It is clear, also, that it does not operate to restrict chancery's jurisdiction respecting child custody. *Smith* v. *Ritter,* 292 Mich 26, 29; *Davis* v. *Davis,* 296 Mich 711, 713; *Johnson* v. *Johnson,* 318 Mich 21, 24.)

It must not be thought, however, that during the period of the English law, above described, chancery stood idly by, lamenting its impotence. "From an early date　*　*　*　the court of chancery exercised jurisdiction to control the father's legal right to his child, so far as such right existed, and where for immorality or other reason the father was an unfit person to have the custody of the child, it was given to another, the welfare of the child being the controlling consideration." Long, A Treatise on the Law of Domestic Relations (3d ed), § 267. One of the leading cases of the later period was that of *Wellesley* v. *Duke of Beaufort,* 2 Russ 1 (38 Eng Rep 236) (see, also, *Wellesley* v. *Wellesley,* 2 Bligh [NS] 124 [4 Eng Rep 1078]) ruling upon a most incredible set of facts. Here the father, both diseased and dissolute, guilty of abuse and ill-treatment of his wife, living in adultery, sought for his children the companionship of others "of the most depraved habits," and deliberately endeavored to train the children in habit and speech, it was testified, so as to "inevitably destroy their moral and civil characters." The lord chancellor's intervention on behalf of the children was unanimously affirmed by the house of lords. On the matter of jurisdiction Lord Redesdale first analogized the father's position with respect to his child, to that of a trustee. "Why," he asked, "is the parent entrusted with the care of his children? Because it is generally supposed he will best execute the trust reposed in him; for that it is a trust, of all trusts the most sacred, none of your lordships can doubt." (*Wellesley* v. *Wellesley, supra,* 128.) He then denied that the father "has that absolute right, which is contended for at the bar" and stated (pp 129, 130), "We find that now, for 150 years, the court of chancery has assumed an authority with respect to the care of infants." Lord Manners was equally explicit, holding (pp 141–143):

"With respect to the first question, I acknowledge I have not attempted to explore the origin, or to ascertain the commencement of the jurisdiction. If I had so done, I should have been anticipated in every thing which might have been said usefully upon the subject, by my noble and learned friend; for it seems to me, indeed, abundantly sufficient for the purpose of this case, that this jurisdiction has been uniformly asserted and repeatedly exercised by successive chancellors for a period of more than a century. I have looked into the cases referred to on the subject, to discover if any chancellor hesitated, or has entertained a doubt as to this jurisdiction. I do not find, from the time of Lord Nottingham to the present day, that any doubt has been stated by the court with respect to the existence of such a jurisdiction. It has, then, become the established jurisdiction of the court; it has become the practice of the court, and as such, a part of the law of the land. Indeed, it is a strong confirmation of this jurisdiction, that, on a writ of habeas corpus being applied for by the father, to have the children restored to him, in the court of king's bench, that court enquires whether they are wards of the court of chancery, and whether there are any proceedings in that court respecting them. If the court of king's bench finds there are such proceedings, it declines to grant the writ. This would be a dereliction of their duty if no such jurisdiction exists; this seems to be a strong judicial recognition of the existence of this jurisdiction, to be exercised by the chancellor in the court of chancery. Upon that ground, therefore, I can entertain no doubt. There was an observation of Mr. Brougham on the subject, that the jurisdiction could not exist, because you could not ascertain the limits of it. That objection applies to every case where there is a discretion in the judge; where the result of the facts is not a question of law, but a question of discretion. It is therefore impossible to say what are the limits of that jurisdiction; every case must depend upon its own circumstances. With respect to the juris-

diction, I should agree with Lord Thurlow, that it is too well established, to be open to question." *Wellesley* v. *Wellesley* (1828).

It is from this historical and equitable background that we find Mr. Justice Cardozo holding, in *Finlay* v. *Finlay*, 240 NY 429, 433 (148 NE 624, 40 ALR 937):

"If we were to assume with the plaintiff that the writ has been denied to him, there would remain his remedy by petition to the chancellor or to the court that has succeeded to the chancellor's prerogative (*Queen* v. *Gyngall*, [1893] 2 QBD 232; *In re Spence*, 2 Phillips 247, 248 [41 Eng Rep 937]; *Wilcox* v. *Wilcox*, 14 NY 575; *Matter of Knowack*, 158 NY 482 [53 NE 676, 44 LRA 699]; *Power* v. *Power*, 65 NJ Eq 93 [55 A 111]). Nothing in the habeas corpus act affects that jurisdiction, inherent in courts of equity, or changes or diminishes the remedy available. * * *

"We find no sufficient reason for discarding this historic remedy and establishing in its place, or even as a supplement, a remedy by action. The difference is more than formal. The chancellor in exercising his jurisdiction upon petition does not proceed upon the theory that the petitioner, whether father or mother, has a cause of action against the other or indeed against any one. He acts as *parens patriae* to do what is best for the interest of the child. He is to put himself in the position of a 'wise, affectionate and careful parent' (*Queen* v. *Gyngall, supra*), and make provision for the child accordingly."

To the same effect is the holding of the Missouri court in *In Matter of Badger,* 286 Mo 139 (226 SW 936, 14 ALR 286), the court holding (pp 145–147, 149):

"These cases * * * will be found to authorize the conclusion that courts of equity, clothed as they are with this general power, may include in its exercise the determination of the personal rights of in-

.fants. If this conclusion be correct, jurisdiction in the instant case may properly be predicated thereon.

"But if resort be had to the illogical refuge that the exercise of the court's power as applied to the case at bar, is not included within and made a part of its general power, then the propriety of that exercise may be sustained on the ground that the protection of infants, even from their parents, is one of the exceptions to the limitation under discussion and constitutes one of the well-established grounds for the exercise of equity jurisdiction in the protection of personal rights. *Shelley* v. *Westbrooke,* Jacob Ch 266 (37 Eng Rep 850); *Warde* v. *Warde,* 2 Phill Ch 786 (41 Eng Rep 1147); *Creuze* v. *Hunter,* 2 Cox Ch 242 (30 Eng Rep 113, 2 Ves Jr 157, 30 Eng Rep 570); *Thomas* v. *Roberts,* 3 DeG & S 758 (64 Eng Rep 693, 19 LJ Ch NS 506); *State* v. *Grisby,* 38 Ark 406; *Cowls* v. *Cowls,* 3 Gilm (8 Ill) 435 (44 Am Dec 708); *State* v. *Stigall,* 22 NJL 286; *People, ex rel. Wilcox,* v. *Wilcox,* 22 Barb (NY) 178; *Ward* v. *Roper,* 7 Humph (26 Tenn) 111; *State* v. *Baird,* 21 NJ Eq 384; *Striplin* v. *Ware,* 36 Ala 87; *In re Flynn,* 2 DeG & S 457 (64 Eng Rep 205); *Eyre* v. *Countess of Shaftesbury,* 2 P Wms 103 (24 Eng Rep 659), as annotated, 2 White & Tudor, Leading Cases in Equity (4th Am ed), pp 1416, 1446.

"Whether this jurisdiction had its origin in the fiction of the right of the king as *parens patriae,* to which we referred approvingly in *State, ex rel. Cave,* v. *Tincher,* 258 Mo 1 (166 SW 1028, Ann Cas 1915D, 696), which right it is contended reverted to the king as the general protector of all the infants in the realm after the abolition of the court of wards (3 Blackstone's Commentaries, p 426; 2 Fonblanque, Equity, bk 2, pt 2, ch 2, § 1, note *a*;* *Eyre* v. *Countess of Shaftesbury,* 2 P Wms 103, 118 [24 Eng Rep 659, 664]; *Wellesley* v. *Wellesley,* 2 Bligh [NS] 124, 136 [4 Eng Rep 1078]; *Wellesley* v. *Duke of Beaufort,* 2 Russ 1, 20 [38 Eng Rep 236]; *Cary* v. *Bertie,*

---

* See Fonblanque, Equity (Ballow) (4th Am ed by Laussat), book 2, pt 2, ch 2, § 1, note *a*, p 468.—REPORTER.

2 Vern 333 [23 Eng Rep 814]; *Morgan* v. *Dillon*, 8 Mod R 135 [88 Eng Rep 361]; *DeManneville* v. *De-Manneville,* 10 Ves Jr 52, 63 [32 Eng Rep 762]; *Ex parte Phillips,* 19 Ves Jr 118 [34 Eng Rep 463]); or that it arose from considering guardianship in the nature of a trust, and trusts being the favored objects of equity, that the jurisdiction had this broad general foundation (*Duke of Beaufort* v. *Berty,* 1 P Wms 703, 705 [24 Eng Rep 579]; 3 Story, Equity Jurisprudence [14th ed], § 1745 and notes); or that it had its origin in one of the old common-law writs in relation to wards (Coke Litt 89a, Hargrave's note 70, 186b; 2 Fonblanque, Equity, bk 2, pt 2, ch 2, § 1); or that it was originally an usurpation for which the best possible excuse was that it afforded opportunity for the beneficent exercise of a power peculiarly equitable in its nature which had not otherwise been sufficiently provided for, is immaterial so far as any of these theories may in a determinative way affect the matter at issue.   (3 Story, Equity Jurisprudence, § 1747 and notes.)   We have stated them simply to show the manner in which the question has been mooted; even this array will not suffice to cover the entire field of conjecture, for it is at best nothing more, to which resort has been had to account for the origin of this jurisdiction.   This much is certain, it exists and has been exercised by courts of equity for more than 2 centuries in England and in the different States of this republic for shorter periods of time but for like reasons and purposes.   See English and American cases cited in 3 Pomeroy, Equity Jurisprudence (4th ed), notes 1 and 2 to section 1304, p 3141; *In re Agar-Ellis,* 24 LR Ch Div 317 (53 LJ Ch NS 10, 50 LT NS 161); *In re Elderton,* 25 LR Ch Div 220 (53 LJ Ch NS 258, 50 LT NS 26); 20 RCL, Parent and Child, § 14, p 599; *Neville* v. *Reed,* 134 Ala 317 (32 So 659, 92 Am St Rep 35); *Kelsey* v. *Green,* 69 Conn 291 (37 A 679, 38 LRA 471); *Lally* v. *Fitz Henry,* 85 Iowa 49 (51 NW 1155, 16 LRA 681); *Meritt* v. *Swimley,* 82 Va 433 (3 Am St Rep 115).   *   *   *

"Brushing aside, therefore, these purely technical

questions as to wardship and the possession of property, what are the impelling reasons for the exercise of the jurisdiction of courts of equity in cases as at bar? The welfare of the child, its life, health and moral and intellectual being are, in a proper exercise of the court's power, to be kept well in view in all controversies concerning its custody, care and control. In addition, if the court be imbued with that spirit of patriotism which should always prompt judicial action along with a proper consideration of the rights of litigants, the welfare of the child should be looked to as a future member of society upon whom in the fullness of time will fall its share of the burdens and responsibilities of citizenship. This may be more homiletic than juridical, but is not the judiciary more immediately charged with the public welfare than either of the other coordinate powers of government?"

We agree with the *Badger Case, supra,* that theories differ as to the origin of the jurisdiction of chancery in the premises (see, also, note to *Eyre* v. *Countess of Shaftesbury,* 2 White & Tudor, Leading Cases in Equity (4th Am ed), pp 1416, 1517) but we do not think exhaustive examination of the question would advance our discussion of the issue. As Story notes in his Equity Jurisprudence (10th ed), § 1337, "But, whatever may be the true origin of the jurisdiction of the court of chancery over the persons and property of infants, it is now conceded, on all sides, to be firmly established and beyond the reach of controversy." It is, as he points out in a later section (§ 1342), "a jurisdiction which seems indispensable to the sound morals, the good order, and the just protection of civilized society." Pomeroy (4 Pomeroy, Equity Jurisprudence [5th ed], § 1307) is equally explicit:

"In addition to its power to appoint guardians, the court of equity will also exercise its jurisdiction, in a

proper case, and to promote the highest welfare of the infant, where there is already a guardian, natural or legal, by controlling the *person* of the infant, and by removing it personally from the custody of its natural or legal guardian, even from the custody of its own parents. \* \* \* The jurisdiction is a delicate one; it rests in the highest degree upon the enlightened discretion of the court, and will only be exercised when plainly demanded as the means of securing the infant's present and future well-being. It is well settled, therefore, that a court of equity may interfere on behalf of infants, and remove them from the custody and control of their father or mother, whenever the habits, practices, instruction, or example of the parent, exerting a personal influence on the infants, tend to corrupt their morals and undermine their principles; or when the parent is neglecting their education suitable for their condition in life; or is endangering their property; or is guilty of ill-treatment or cruelty towards them."

The learned author adds, by way of footnote, comments particularly germane to the issue before us:

"My only purpose is to cite authorities establishing the jurisdiction; but these very cases will disclose the circumstances which call for its exercise. There is one fundamental rule, *viz.,* that the exercise of the jurisdiction depends upon the sound and enlightened discretion of the court, and has for its sole object the highest well-being of the infant; it should never, therefore, be influenced by any *sentimental* considerations in behalf of either the mother or the father."

The pertinence of the English law, as well as the wide sweep of chancery's powers in this jurisdiction, is revealed in CL 1948, § 606.4 (Stat Ann § 27.545), dealing with jurisdiction in chancery, commencing with the familiar words:

"Sec. 4. The powers and jurisdiction of the circuit courts and circuit judges in chancery, in and for

their respective counties, shall be co-extensive with the powers and jurisdiction of the courts and judges in chancery in England as existing on March first, 1847, with the exceptions, additions and limitations created and imposed by the Constitution and laws of this State."

It was thus that we held in *Hunt* v. *Wayne Circuit Judges,* 142 Mich 93, 113 (3 LRA NS 564, 7 Ann Cas 821) (a suit testing the validity of statute creating the juvenile court):

"In England the court of chancery, originally the keeper of the king's conscience in his paternal relations to all his subjects, has uniformly assumed to place the interest of the child above the natural rights of parents and the legal rights of guardians, and in this country the same courts have exercised the same jurisdiction, basing such jurisdiction equally upon the inherent power of the court and upon statutory authority."

Likewise in *Metzner* v. *Newman,* 224 Mich 324, 331 (33 ALR 98) (bill in chancery on behalf of an infant to validate a compromise settlement of will contest):

"Our chancery court has, from its inception, been the protector and guardian of infants and their property rights. By statute some of this jurisdiction is shared by our probate courts. Our chancery courts acquired this right and jurisdiction by the adoption of the common law."

We conclude that, upon this bill as filed, the chancellor had inherent jurisdiction to protect the welfare of the infant. But the trial chancellor's misgivings arose not only from his uncertainty as to his inherent jurisdiction but also as to the jurisdiction of the probate court in the premises. Does the remedy here sought (custody of the child) lie exclusively with the juvenile division of the probate court?

The matter of the jurisdiction of the juvenile divi-sion of the probate courts has been so beclouded by a welter of conflicting claims and assertions that it may be well to re-examine the subject in the light of the presently applicable constitutional and statutory provisions. We will examine *seriatim* some of the assertions made with respect to it:

1. Frequently, either as an introductory sentence or as a clincher to argument, it is said that modern courts of chancery are without jurisdiction as to children because there is now an adequate remedy at law. (This refers to the legislation common today respecting juvenile courts and their functions.) The answer here is that general propositions, such as "equity acts *in personam*," equity will not act "if there is an adequate remedy at law," and so forth, do not answer specific cases. The general propo-sition concerning the adequacy of the legal remedy is, of course, countered by another equally axio-matic: Where equity has traditional jurisdiction it is not ousted or abridged by a statute which, with-out more, confers jurisdiction over the subject mat-ter to courts of law. The maxims thus having neu-tralized each other we turn to matters more specific.

2. It is sometimes said that chancery does not now "retain" for all purposes its "former" broad jurisdiction over children. In support thereof it is pointed out that the Constitution of 1908 placed in the probate courts "original [but not *exclusive* orig-inal] jurisdiction in all cases of juvenile delinquents and dependents."

But this, it will be observed, is not a grant of "ex-clusive" original jurisdiction in all such cases. It is on this very point (of exclusive *vs.* nonexclusive jurisdiction) that we find at least 2 categories of con-stitutional provisions: (a) Some, like Michigan, do not purport to make juvenile jurisdiction exclu-sive in any court. (b) Others, like Colorado (see

constitutional amendment of 1912, art 6, § 1) contain language employing the term "exclusive" with respect to juvenile court legislation.

Our Constitution, then, grants "original jurisdiction" to probate in certain cases. This term "original jurisdiction" has a meaning well settled in the law. It simply means jurisdiction to hear and decide cases in the first instance, as opposed to appellate jurisdiction. But there is a vast difference between a court having *exclusive* original jurisdiction of certain types of cases, and a court having merely original jurisdiction. It is the difference between monogamy and polygamy. The cases are legion* holding that original jurisdiction does not mean exclusive jurisdiction and we would do well to respect the well-known differentiation made in both constitutional and statutory language lest we render even more obscure a concept (jurisdiction) already giving much difficulty to our Court (*Fritts* v. *Krugh*, 354 Mich 97).

Thus the Constitution of 1908 does not grant exclusive original jurisdiction to the probate courts and we cannot add it. The legislature did purport to grant exclusive jurisdiction to the probate courts† in cases involving what is usually denominated delinquency but we do not have such a case before us. Our case involves not delinquency but a contest between parents for custody arising out of custodial deficiencies alleged by one of the parents themselves to be so grave as to amount to neglect.

3. The exercise by the circuit court in chancery of its historic powers with respect to neglected children has sometimes been pictured as an attempted "revival" by chancery of presumably lost or aban-

---

* See *Bors* v. *Preston*, 111 US 252 (4 S Ct 407, 28 L ed 419); *Crowell* v. *Lambert*, 10 Minn 369; *Petros* v. *Bosen*, 185 Okla 351 (91 P2d 735); *Pooly* v. *Luco*, 76 F 146.

† See CLS 1956, § 712A.2 (Stat Ann 1957 Cum Supp § 27.3178 [598.2]).

doned powers, in the teeth of constitutional and statutory prohibition thereof. This position is sought to be buttressed by an underlining of the constitutional grant to probate of (exclusive or original?) jurisdiction in *all* cases of juvenile delinquents and dependents, together with a delineation of the alleged catastrophic effects of concurrent jurisdiction shared by chancery and probate, resulting in confusion, delay and damaging detention of children.

We will comment briefly. First, as to the law. There is (a) no constitutional grant of exclusive jurisdiction as to either delinquent, dependent, or neglected children in the probate courts; there is (b) not even a statutory grant of exclusive jurisdiction to probate, save in one situation (that of delinquency) and that case is not here. Thus with respect to the case before us there has been neither loss nor abandonment by chancery of any of its powers and any talk of attempted revival of powers is completely without foundation in the law.

As to concurrent jurisdiction, this is not a situation of our Court's creation nor is it subject to our destruction. The basic conflict between chancery and probate is constitutional. The circuit courts in chancery have a constitutional original jurisdiction in *all* civil and criminal matters (not taken from them by the Constitution or prohibited by law) :* the probate courts have a constitutional original jurisdiction in *all* cases of juvenile delinquents and dependents.† Thus since the Constitution establishes 2 courts with original jurisdiction, neither, as we pointed out *supra,* has exclusive jurisdiction. Concurrent jurisdiction is the creature of the Constitution, not of the courts and it has been exercised for many years. *Schell* v. *Schell,* 257 Mich 85, remains authoritative, save as modified by statute.

---

* Art 7, § 10.
† Art 7, § 13.

. Thus the legal argument advanced resolves itself into this: With respect to the case before us, that of an allegedly neglected child, a nonexistent constitutional provision, plus an imaginary statutory prohibition of jurisdiction, have been combined to effectuate a wholly hypothetical loss of chancery jurisdiction, resulting in some kind of no-man's land in the jurisdiction of the courts. Chancery's historic jurisdiction having been thus neatly disposed of by a series of fictions, it is asserted that it would be unwise to attempt to revive or re-create it for reasons of policy, described in such terms as catastrophic and damaging.

Aside from the fact that there need be no recreation of what has never been destroyed, the policy argument itself opens a wide door. The problems involving today's juveniles are numerous and complex, and many State agencies deal with them, not only the agencies of the law, such as the courts and the corrections commission, but also civic and church groups, all working devotedly for the public good. As is natural with a problem so complex, various groups advocate and stress various solutions. Specifically, with respect to the courts, forces have been battling in this State for years to effect a supremacy, in these juvenile matters, of either probate or chancery. Should either court handle exclusively such matters? If so, which one? We hear of probate's specialized staffs, skills, procedures, and so forth, of reasons, many of them persuasive. why probate should be the only court dealing in children's matters. Per contra, it is pointed out that probate has no jurisdiction whatever in divorce causes, where the problems of the children are often paramount, and that it lacks chancery's historic and powerful weapons of remedy, solace and protection; that is to say, that it lacks power to use the injunction, the historic equitable trust, the traditional chancery or-

der *in personam,* and other unique and powerful devices through which the conscience of the chancellor found ready expression in the years past and which should remain as available to the infant victim of modern industrial society as they were with respect to the abuses of a simpler day.   From still another quarter we hear that the only workable solution is some kind of a family court having all of chancery's historic powers, plus the specialized staffing of probate.*

But the choice between these competing considerations has not yet been made and it is not for us to make.   True, we have the power (since no court sits above us) but we have not the right to solve the whole business simply by ruling that chancery's historic powers are either atrophied through disuse or entirely prohibited by law, following which we could reverse all exercise by chancery of its ancient and powerful remedies, and thus we might establish the exclusive jurisdiction of probate in all children's cases.

But of this we will have no part.   Such action is not the interpretation of statutory language or language shrouded in ambiguity, for we all know what "exclusive" means and what "original jurisdiction" means as here employed.   Nor is this the filling-in of "interstitial gaps" in legislation.   This is the deliberate addition of language (*exclusive* original jurisdiction) that the legislature and constitutional convention knew how to use but did not use, we thus effectuating by our own act a social policy, through court control, that these bodies refrained from effectuating, and as to the wisdom of which there is much debate among zealous partisans, all equally well-meaning, equally motivated by the highest ideals.

* See discussion of this and related problems in 37 MSBJ, July, 1958, p 14, Virtue, "What is a Family Court?"

Such action we cannot take. We are not at large. We are a court. Our constitutional restraints are none the less effective, none the less binding, because their application is confided to our own hands and hearts. The trust in judicial self-restraint reposed in us by our form of government will be discharged with a devotion commensurate with the faith implicit in its delegation.

In the light of the above, is there any impediment to the exercise by chancery in this case, of its inherent jurisdiction? We turn to the applicable statutes, general reference to which has been made in the above discussion. The jurisdiction of the juvenile division of the probate court is set forth in section 2 of chapter 12A of the probate code, as amended (CLS 1956, § 712A.2 [Stat Ann 1957 Cum Supp § 27.3178 (598.2)]). It is there provided, in part, as follows:

"Sec. 2. Except as provided herein, the juvenile division of the probate court shall have:

"(a) Exclusive original jurisdiction superior to and regardless of the jurisdiction of any other court in proceedings concerning any child under 17 years of age found within the county .

"(1) Who has violated any municipal ordinance or law of the State or of the United States; or

"(2) Who has deserted his home without sufficient cause or who is repeatedly disobedient to the reasonable and lawful commands of his parents, guardian or other custodian; or

"(3) Who repeatedly associates with immoral persons, or who is leading an immoral life; or is found on premises occupied or used, for illegal purposes; or

"(4) Who, being required by law to attend school, wilfully and repeatedly absents himself therefrom, or repeatedly violates rules and regulations thereof; or

"(5) Who habitually idles away his or her time; or.

"(6) Who repeatedly patronizes or frequents any. tavern or place where the principal purpose of the business conducted is the sale of alcoholic liquors.

"(b) Jurisdiction in proceedings concerning any child under 17 years of age found within the county

"(1) Whose parent or other person legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide proper or necessary support, education as required by law, medical, surgical or other care necessary for his health, morals or well-being, or who is abandoned by his parents, guardian or other custodian, or who is otherwise without proper custody or guardianship; or

"(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality or depravity on the part of a parent, guardian or other custodian, is an unfit place for such child to live in, or whose mother is unmarried and without adequate provision for care and support."

The statutory scheme is manifest. The first subdivision above (a) concerns what is usually referred to the delinquency situation, although the use of the word itself has been avoided in order to avoid so stigmatizing the child. The subdivision concerns jurisdiction relating to various illegal acts committed by the child, law-breaking, incorrigibility, and similar offenses. There is none of that even alleged in the present case, hence, we do not get into the constitutional question turning upon the purported statutory grant of "exclusive original jurisdiction superior to and regardless of the jurisdiction of any other court" when such other court is a court of chancery having first obtained jurisdiction over the child in a proceeding properly brought before it. The resolution of that question, freighted with potentialities of an unseemly tug-of-war between 2 courts, with an infant as the prize, we may thus de-

fer. The second subdivision above (b) refers to situations usually described as those of "neglect." Taken together, the 2 subdivisions encompass a variety of situations in which the welfare of the child is endangered, either through his own acts or the acts or failures of others. In such situations, sufficiently grave, parental control may be regarded as forfeited and may be displaced by that of appropriate agencies of the State.

The normal parental custody is not, however, to be lightly usurped. The intervention of the State, through its proper agencies, is exercised only in the cases of the most impelling necessity. As above noted, here we are not dealing with what is sometimes referred to as the delinquency situation, that is, where the control of the parents has been so lax, or ineffective, as to be nonexistent and the child itself has been guilty of proscribed acts. No such acts are alleged and thus the statutory grant of exclusive jurisdiction to the juvenile division of the probate court in such cases is not involved. Nor do we rule upon any phase of the difficult and delicate matter of the concurrent jurisdiction between chancery and probate, merely, as above, recognizing its existence, since the jurisdiction of the juvenile division of the probate court has not been invoked and it has not purported to exercise such jurisdiction. Similarly, we are not ruling upon the extent of probate jurisdiction, power, or authority to award custody to a third person in the situation presented where only one of the parents is at fault, the other being ready, able and willing properly to care for the child. No third person is here involved. We mention these limitations not only because the diligence of *amici curiae* has directed our attention to the gravity of such issues, but because we have no wish to encumber the law in a delicate and complex area with a mass of dicta. We will meet these situations as they arise,

guided, as always, by our abiding concern for those infants deprived of normal parental care either through human weakness or despair, or the inexorable march of a seemingly malignant fate.

In the matter before us we have a case in which the welfare of a child is allegedly threatened by pernicious influences. The child himself is not delinquent. Neither is he abandoned to strangers. Both parents are alive and both expressing solicitude for his welfare. If there is neglect, it is denied, with the counterassertion of proper school and church influences. The controversy lies in the realm of moral influences, arising out of bitter and apparently irreconcilable conflict between mother and father. This is the area in which the chancellor has, for many years, asserted his great powers in the protection of the welfare of the unfortunate child of the unfortunate parents. Nothing in our Constitution or statutes strips him of these historic powers, so repeatedly exercised. The court of chancery, then, having jurisdiction over the persons, may and must, in the exercise of its inherent jurisdiction over the subject matter, proceed to its final determination on the merits.

The order dismissing the petition is reversed and the cause remanded for further proceedings not inconsistent herewith. No costs, a public question.

BLACK and VOELKER, JJ., concurred with SMITH, J.

EDWARDS, J. The appeal presented to us is a contest as to child custody between 2 bitterly estranged parents. A final decision in a preceding divorce case denied divorce to each (*Sovereign* v. *Sovereign,* 347 Mich 205).

The circuit judge felt that he had neither statutory nor inherent authority to hear the dispute, and dismissed the petition.

Mr. Justice Smith would reverse on the ground that the circuit court is heir to the powers formerly assumed and exercised by the court of chancery in relation to children's cases.

We find no specific statutory provisions which deal with this particular custody problem. For that matter, there appears to be little case law on the subject except the dictum in *In re Knott,* 162 Mich 10, which supports Mr. Justice Smith's result. Thus, as to this immediate problem which would otherwise fall into a jurisdictional no-man's land, we feel the general and historic chancery power of the circuit court is applicable.

We do not, however, agree that the circuit courts of Michigan sitting in chancery retain for all purposes the broad jurisdiction over children formerly exercised by the chancery courts.

Article 7, § 10, of the Constitution (1908), does give circuit courts "original jurisdiction in all matters civil and criminal not excepted in this Constitution and not prohibited by law."

See, also, CL 1948, § 606.4 (Stat Ann 1957 Cum Supp § 27.545) ; CL 1948, § 722.541 (Stat Ann 1957 Rev § 25.311).

But since the turn of the century, Michigan has been one of the leading States in the development of a court with specialized powers and functions in relation to dependent, neglected and delinquent children.* Jurisdiction as to this category of cases was placed by the Constitution of 1908, art 7, § 13 in the probate courts:

"They shall also have original jurisdiction in *all* cases of juvenile delinquents and dependents." (Emphasis supplied.)

---

* See writer's comment, Michigan's Juvenile Code after Fifty Years, 31 MSBJ, August, 1952, p 24.

(See, also, *Hunt* v. *Wayne Circuit Judges*, 142 Mich 93 (3 LRA NS 564, 7 Ann Cas 821) ; *Robison* v. *Wayne Circuit Judges*, 151 Mich 315, handed down prior to the constitutional amendment just quoted; and *In re Mould*, 162 Mich 1, and *Attorney General, ex rel. Dingeman*, v. *Lacy*, 180 Mich 329, decided subsequent thereto.)

Further, as authorized by the Constitution, detailed legislation spelling out the jurisdiction and the powers of disposition of the probate court, juvenile division, in relation to children has been adopted. CLS 1956, §§ 712A.2, 712A.18 (Stat Ann 1957 Cum Supp §§ 27.3178[598.2], 27.3178[598.18]).

Further, by specific statutory enactment, the circuit courts are granted appellate powers over the decisions of the probate court, juvenile division. CL 1948, § 712A.22 (Stat Ann 1957 Cum Supp § 27.3178 [598.22]).

These constitutional and statutory provisions appear to follow a popular and legislative design in the creation of a division of the probate court with special jurisdiction, special powers of disposition, and specialized staffing as to children's problems in dependency and delinquency cases.

We feel the revival of the use by the circuit court in chancery of broad powers in children's cases concurrent with the constitutional and statutory powers of the probate court, juvenile division, would be catastrophic for the children for whom this State has plainly intended to create these specialized services. The confusion and delay attendant upon the exercise of original jurisdiction by both circuit and probate courts in dependency and delinquency cases would confound court administration and undoubtedly result in lengthened and more damaging detention of children pending disposition.

Fortunately, the constitutional and statutory provisions which we have cited, by creating specific ex-

ceptions to the general jurisdiction of the circuit courts, prohibit any such undesirable result.

Further, where by statute a full and adequate legal remedy has been provided, it is generally held that equity will not entertain jurisdiction. *Campau* v. *Godfrey,* 18 Mich 27 (100 Am Dec 133); *Marshall* v. *Ullmann,* 335 Mich 66; *Weinhardt* v. *Addison Community Schools,* 347 Mich 683; 19 Am Jur, Equity, §§ 100, 101.

In the particular fact situation presented by the instant petition, however, we have a different problem. Here, we have no allegations or showing of dependency or delinquency. The custody controversy is between 2 persons who are the natural and legal parents of the child. With prior dismissal of the divorce suits, there is no specific statutory remedy available in any court—indeed, there is no provision for adjudication of this parental dispute over child custody at all—absent general chancery jurisdiction. Hence, we concur with Mr. Justice SMITH in reversal for hearing by the chancellor.

DETHMERS, C. J., and CARR and KELLY, JJ., concurred with EDWARDS, J.

KAVANAGH, J., took no part in the decision of this case.